IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO. 8:10CR358 |
| Plaintiff, | ) | |
| | ) | MEMORANDUM |
| vs. | ) | AND ORDER |
| | ) | |
| JACYNDA J. LECH, | ) | |
| Defendant. | ) | |

This matter is before the Court on the Findings and Recommendation (Filing No. 95) issued by Magistrate Judge F.A. Gossett recommending denial of the motion to suppress filed by the Defendant, Jacynda J. Lech (Filing No. 87). Lech filed a statement of objections to the Report and Recommendation and a supporting brief (Filing Nos. 97, 98) as allowed by 28 U.S.C. § 636(b)(1)(C) and NECrimR 57.3(a). The government has not filed any briefs addressing the motion.

Lech is charged in a two-count Indictment with: receiving and distributing child pornography (Count I); and possessing child pornography, or aiding and abetting the crime (Count II). She seeks an order suppressing statements made to law enforcement during her August 5, 2010, questioning at her residence.

Following an evidentiary hearing, Judge Gossett issued oral findings of fact and conclusions of law, referred to in his Findings and Recommendation, in which he concluded that Lech's statements were voluntarily, knowingly, and intelligently given. Therefore, Judge Gossett recommends that the motion to suppress be denied.

## STANDARD OF REVIEW

Pursuant to 28 U.S.C. § 636(b)(1)(C) and NECrimR 57.3(a), the Court shall make a de novo determination of those portions of the findings and recommendations to which

Lech has objected. The Court may accept, reject, or modify, in whole or in part, the Magistrate Judge's findings or recommendation. The Court may also receive further evidence or remand the matter to the Magistrate Judge with instructions.

## STATEMENT OF FACTS

At 6:30 a.m. on August 5, 2010, Officer Mark Dishaw, of the Douglas County Sheriff's Office and the FBI Cyber Crimes Task Force, and approximately five other officers executed a search warrant at an Omaha apartment occupied by Lech and her boyfriend, Daniel Nieto. When the officers entered and secured the residence, they shouted:

> Police officer, police, search warrant. Stay seated. Where is he at? In the bedroom? Police officer, search warrant. Police officer, sound off. Let me see your hands. Keep your hands up. Come over here. Come here. Come out. Come here. Let me look. Police officer, search warrant, all secured.

(Tr. 22; Exhibit 1.)[1]

The officers drew their weapons and wore "plain clothes along with [their] bulletproof vests and . . . sheriff attire or other attire." (*Id.* at 21-22.) Officers were seeking digital media with evidence of child pornography and possible suspects. Lech and Nieto were both present. Officers did not immediately suspect Lech was the person who had downloaded the child pornography because Nieto was a convicted sex offender and, in Officer Dishaw's experience, it was unusual for women to be involved in this activity. Nieto was taken to the living room, while Lech was first interviewed in the couple's small bedroom. The apartment was described as "pretty small," with the living room connected to the bedroom. The interview was audio recorded, but some of the recording is

---

[1]Exhibit numbers refer to exhibits received during the suppression hearing (Filing No. 91), unless otherwise noted.

unintelligible.  The bedroom door was closed.  Lech sat on the bed for her interview. Officers Dishaw and Scott Haugaard of the Nebraska State Patrol were three or four feet away from Lech.  Officers told Lech that she was free to leave and not under arrest and that they were investigating a child pornography computer crime.  Officer Haugraad told Lech he had some "quick questions" for her.  *Miranda* warnings were not given.  Lech identified her laptop and Nieto's laptop.  She denied downloading child pornography.  Lech said she and Nieto had been together about a year and a half.  Lech knew Nieto was a sex offender.  She stated she had never been arrested.  Lech told the officers she worked as a certified nursing assistant ("CNA").  Lech's initial interview lasted about five minutes. During this portion of her interview, her responses appeared normal and appropriate.  Lech was then taken to the living room while officers questioned Nieto in the bedroom with the door closed.  Nieto denied any knowledge of child pornography.  During this time a State Patrol officer conducted a "preview" on Lech's computer and found child pornography on that computer.

Approximately thirty minutes later, officers moved Nieto to the living room and again questioned Lech in the bedroom for twenty to twenty-five minutes.  The seating arrangement was the same.  Officers again told Lech she was not under arrest and free to go, but that they had found child pornography on her computer and had some additional questions.  Again, *Miranda* warnings were not given.

During the questioning, there was some initial discussion about Limewire.  Lech again denied downloading child pornography.  Lech said she bought her laptop at Best Buy.  Lech stated she would be responsible for material on her laptop.  She described search terms she used, such as "little girl" and "teen."  Lech was unfamiliar with search

terms "PTHC"[2] and "Lolita"[3] that are commonly used in searching for child pornography. Lech's unfamiliarity with basic computer terms such as "download," "update," "thumb drive," and "operating system" was evident. During the interrogation, Officer Haugaard showed Lech a video found on her computer, depicting the rape of a 6-year-old girl. He also showed Lech additional photographs and videos found on her computer. Eventually, Lech indicated, in response to leading questions, that she had been downloading child pornography. During this second interview, Lech's answers were often one-word answers or short answers comprised of key words used in the question. Dishaw testified that Lech was "[v]ery compliant," and not defensive. (Tr. 18, 34.) He elaborated on Lech's willingness to cooperate:

> A.  She was actually probably more cooperative than a lot of people I have dealt with in the past.
>
> Q.  In what way?
>
> A.  Again, she appeared to be willing to cooperate with us, give us statements obviously that we were looking for as far as responsibility for this – investigation goes. There was nothing defensive on her part or our part.

(Tr. 18.)

Officer Dishaw testified that no promises were made and no "strong-arm" tactics were used because "[t]here was no need to" do so. (Tr. 21.) Officer Haugaard told Lech more than once that he wanted to tell the judge and prosecutor that she "fessed up." Through questioning Lech, Officer Haugraad determined that looking at the images and

---

[2] Officer Haugraad told Lech the letters stand for "pre-teen hard core."

[3] Officer Haugraad told Lech "Lolita" refers to a collection of pictures.

videos did not excite her, and he explained to her why he asked such questions. He questioned Lech more about her CNA license and work. Lech said she and Nieto had viewed the images together, and, through questioning, she described how they did so. Almost twenty minutes into the second interview, Officer Haugraad told Lech that she was in trouble for possessing child pornography, and Lech asked, "possessing what?" Officer Haugraad told Lech that Nieto would be in trouble with his probation officer if he were caught possessing child pornography:

> Officer Haugraad: What I'm looking for here, I'm looking for you to completely cooperate with me, okay. And basically what I am looking for you is to write a confession, okay. You downloaded it. Daniel didn't have anything to do with it. He saw it on one occasion. He didn't want anything to do with it, okay. That will keep him out of trouble, okay, completely out of trouble, all right.
>
> Lech: Completely?
>
> Officer Haugaard: And that will be the last thing he needs, his last, what, four years, four months on probation is for his probation officer to think he was a part of this.
>
> Lech: Right.
>
> Officer Haugaard: Right?
>
> Lech: I understand.
>
> Officer Haugaard: His probation officer isn't going to like me calling him.

(Tr. 33-34; Exhibit 1.)

Officer Haugaard asked Lech why she was looking at him a certain way and biting her fingernails. She responded that she was scared. Officer Haugraad then told Lech:

> What I'm looking for you is for you to 'fess up. I want you to understand that you don't have to write this for me, okay. You understand that you are not under arrest and basically you don't have to talk to me. But yet I want you

> to understand that later on down the road this is your one opportunity for the judge and the prosecutor, okay, because you *are* in trouble. This is your one opportunity to tell those two people what you did. You 'fessed up to it and this is how you want to make amends.

(Tr. 34-35; Exhibit 1.) At least one other similar statement was made earlier during the second interview.

Officer Haugraad then coached Lech regarding how she should draft her confession, alternating between use of the "first person" and "second person." He said: "I did this for *one or two times*. I saw it. *I'm never going to do it again. I'm going to get some help* regardless of whether you need it or not, so that you can make sure that you are all right, okay? And that's what I'm looking for. I want you to basically tell them what you're thinking right now." (emphasis added).

Lech then wrote out her statement: "I talk to Scott about looking at child porn only 2 time don't want to do it again want to get help." (Exhibit 113.)

Officer Dishaw testified that he and Officer Haugaard returned to the apartment on August 18, 2010, because they wanted to find out who was responsible for pornographic videos found on a disk seized during the search. This contact lasted a few minutes. Lech said the disks were Nieto's. When Lech was told they were found on one side of the bed, she said that side was Nieto's.

Additional facts relating to Lech's mental and educational abilities are noted below.

## DISCUSSION

### I. Factual Findings

The Defendant objects to specific portions of Judge Gossett's Findings and Recommendation. Specifically, she objects to the following factual findings:

- all of her answers given during her questioning "were proper and were a response";

- no threats or promises were made that caused her to give a statement;

- after being told child pornography was on her computer, she admitted it was hers; and

- during the first interview she said she had a high school education and was certified as a CNA.

Lech also argues that Judge Gossett failed to make findings of fact based on the testimony and exhibits received at both the suppression and competency hearings.

## A. Lech's Answers

Lech argues that many, if not most, of the questions posed to her by Officer Haugaard were leading. She states she provided more than 70 one-word answers that included almost 10 "uh-huh" responses, at least 28 "no" responses, and almost 40 "yes/yeah/okay" answers. She also argues that even her written confession was a recapitulation of Officer Haugaard's words. She therefore argues the factual finding that "[a]ll the answers that she gave . . . were proper and were a response" was inaccurate. (Tr. 52.)

As discussed below, as the Court addresses the voluntariness of Lech's statement, the Court shares this concerns with respect to her responses. Because the words "proper" and "responsive" have no precise definition, however, and because this objection was not briefed independent of the issue of voluntariness, the objection is denied.

**B.     Threats or Promises**

Lech disputes the finding that "no threat, promise or inducement was made" that led to her statement. (Tr. 52.) Essentially, Officer Haugaard promised Lech that if she confessed her boyfriend, Daniel Nieto, who was a sex offender, would not be "in trouble." Officer Haugraad specifically told Lech that the last thing Nieto needed was for his probation officer to learn of the presence of child pornography on Lech's computer, and if she would add to her written statement that Nieto had nothing to do with the pornography he would be kept "out of trouble." Therefore, insofar as Lech objects to the Magistrate Judge's finding of fact regarding the existence of any promise or threat, the objection is granted. Whether that promise induced Lech to make her incriminating statements is discussed below with respect to the voluntariness issue. Because the Court cannot know whether the promise alone induced Lech's confession, in that respect the objection will be denied.

**C.     Lech's Alleged Admissions**

Lech objects to the factual finding that "[s]he admitted after being told it was on her computer that it was hers." (Tr. 48.) The objection is denied. During her interview, Lech stated she was responsible for anything found on her computer.

**D.     First Interview; Education**

Lech objects to the finding that she stated during her first interview that she had a high school education and certification as a CNA. The finding appears to be based on Officer Dishaw's testimony on direct examination that during the initial interview these matters were discussed. Officer Dishaw testified on cross examination, however, that he

8

was not sure whether these issues were discussed during the first or second interview. (Tr. 24.) The audio recording reveals that during the first interview Lech only stated she worked as a CNA. Her certification as a CNA and high school education were not discussed until the second interview. Therefore, the objection is granted.

**E.    Additional Findings of Fact**

**1.    Exhibits 111 and 112 - Suppression Hearing**

Lech argues that the Magistrate Judge erred in not making findings of fact based on Exhibits 111 and 112 from the suppression hearing. Exhibits 111 and 112 are the resume and report of Daniel R. Wilson, M.D., Ph.D. Judge Gossett found Dr. Wilson and his conclusions in his report "less than credible" for reasons stated on the record. (Tr. 48, 50-51.) This Court will not reverse this credibility finding. Therefore, findings of fact based on Exhibits 111 and 112 are not necessary. The objection is denied with respect to Exhibits 111 and 112 from the suppression hearing.

**2.    Exhibits - Competency Hearing**

Lech also argues that Judge Gossett erred in not making findings of fact based on the transcript of, and Exhibits 101-110 received at, the competency hearing. (Filing Nos. 34, 48, 66.) The Court agrees that these matters are related, and important to, the issue of the voluntariness of Lech's statements and that no findings of fact were made with respect to any of the matters included in the transcript of, or exhibits received at, the competency hearing. Because such findings are particularly relevant to the voluntariness issue, the objection is granted with respect to the transcript and exhibits from the competency hearing.

Therefore, based on the record of the competency hearing this Court makes these additional findings of fact from the report of the forensic unit psychologist at the Federal Bureau of Prisons' Federal Detention Center in Seatac, Washington, used in determining Lech's competency to stand trial:

- Lech is in the Extremely Low range of intellectual functioning when compared with individuals of her age (Filing No. 66, Exhibit 1, at 9);
- Lech has an estimated full scale IQ of 67, placing her in the first percentile (*Id.*);
- Lech repeated the second grade (*Id.*, Exhibits 109-110);
- According to Lech, she was enrolled in special education classes (*Id.*, Exhibit 1, at 4);
- the Personality Assessment Inventory revealed that Lech "places a high value on harmonious relationships and is likely uncomfortable with interpersonal confrontation or conflict" (*Id.*, Exhibit 1, at 10);
- Borderline Intellectual Functioning is noted on Axis II, and Lech functions "somewhat higher than a mentally retarded individual" (*Id.* at 11);
- while Lech was found to be competent, she "may have a tendency to state that she understands a concept or information when in fact she may only have a partial or inadequate understanding" (*Id.* at 13).

(Filing No. 66, Exhibit 1.)

With respect to the remainder of findings of fact made by Judge Gossett, the Court has considered the transcripts of the suppression and competency hearings and the evidence admitted with respect to both matters. The Court also notes that it played the

audio recording several times. Based on the Court's de novo review of the evidence and arguments, the Court adopts the balance of Judge Gossett's factual findings.

## II.   Legal Conclusions

Lech objects to the following legal conclusions:

- the government's witness, Deputy Mark Dishaw, was credible;

- the author of defense Exhibits 111 and 112, Dr. Daniel R. Wilson, was not credible; and

- Lech's statements were voluntary.

## A.   Officer Dishaw

Judge Gossett found Officer Dishaw to be credible. (Tr. 48, 50.) Specifically, Judge Gossett found" "for the most part, [Officer Dishaw's testimony] is almost untouched. Some of the specifics of why he did it and what happened are contradicted, but for the most part, factually, it flows."  (Tr. 50.)

This Court has some difficulty with the credibility finding when Officer Dishaw's testimony is compared to the audio recording. For example, Officer Dishaw initially testified that Lech's high school and CNA education were discussed during the first interview. However, as he admitted on cross examination, and as shown in the audio recording, this was not the case. More important, Officer Dishaw often testified that Lech "stated" various matters. However, as argued thoroughly by the defense in the brief supporting Lech's objections to the Findings and Recommendation,[4] her so-called statements were often mere agreements to questions asked by Officer Haugaard, often in one-word answers or

---

[4] The defense presented numerous examples of the instances of repetition and one-word answers.

11

brief answers mimicking key terms from the questions. Her answers often did not rise to the level of incriminating "statements." Therefore, based on the audio recording, the Court finds Officer Dishaw only partially credible.

**B.    Dr. Wilson**

Daniel R. Wilson, M.D., Ph.D., is Professor and Chairman of Psychiatry and Professor of Anthropology at Creighton University. Dr. Wilson evaluated Lech and offered his opinions regarding matters relating to Lech's ability to make a voluntary statement. Judge Gossett found Dr. Wilson not credible, primarily because Dr. Wilson stated that Lech made a false confession. Judge Gossett reasoned that Dr. Wilson lacked the knowledge to determine whether Lech's confession was false.

The Court will not revisit Judge Gossett's credibility decision with respect to Dr. Wilson. However, the Court adds that, given the judicially noticed record made during Lech's competency proceedings, Dr. Wilson's opinions are not necessary.

**C.    Voluntariness of Lech's Statements**

The government has the burden of showing by a preponderance of the evidence that a confession was voluntary. *United States v. Boslau,* 632 F.3d 422, 429 (8th Cir. 2011). The test for determining whether a noncustodial statement was voluntary is whether, under the totality of the circumstances, "'the police extracted the confession by threats, violence, or direct or implied promises, such that the defendant's will was overborne and [her] capacity for self-determination critically impaired.'" *United States v. Estey,* 595 F.3d 836, 839 (8th Cir.) (quoting *United States v. Gannon,* 531 F.3d 657, 661 (8th Cir.2008)), *cert. denied,* 130 S. Ct. 3342 (2010). "The Supreme Court has long indicated that one of the key concerns in judging whether confessions were involuntary, or the product of coercion, was

the intelligence, mental state, or any other factors possessed by the defendant that might make [her] particularly suggestible, and susceptible to having [her] will overborne." *Wilson v. Lawrence Cnty.,* 260 F.3d 946, 952 (8th Cir. 2001).

The government stresses the requirement of "coercive police activity" as a "necessary predicate" for a conclusion that Lech's statements were involuntary, under *Colorado v. Connelly*, 479 U.S. 157, 167 (1986). Lech argues, however, that the Court must balance her ability to resist the pressure to confess with the element of police overreaching, which may be subtle. Mental deficiencies alone are insufficient to support a conclusion of involuntariness. *Id.* at 165; *United States v. Vinton,* 631 F.3d 476, 482 (8th Cir.), *cert. denied,* No. 10-11091, 2011 WL 4532387 (2011); *Wilson,* 260 F.3d at 953. In *Wilson,* the court paid particular attention to the following matters that are also relevant to Lech's case: placement in special education; and mental handicap; "in addition to the general threats and intimidation . . . [and] leading questions." *Wilson,* 260 F.3d at 953. The Court agrees that an "objective evaluation of police conduct must take into consideration defendant's mental condition," and when a situation involves a more vulnerable person, the suspect's will being overborne by less egregious, perhaps merely subtle, police coercion. 2 WAYNE R. LAFAVE, ET AL., Criminal Procedure § 6.2(c), at 644-45 (3d ed. 2007).

Viewing Lech's situation, the Court has paid meticulous attention[5] to the audio recording as the only evidence that truly depicts Lech's questioning and the surrounding events. Apparently, the entry of six police officers with guns drawn while shouting "search warrant" at 6:30 a.m. to search computers was justified by Nieto's prior conviction. There

---

[5]The Court listened to the recording more than ten times.

was no indication that Nieto and/or Lech posed a risk of violence, and it does not appear likely that the type of evidence sought could be easily destroyed. Lech does not contest the search warrant or the manner of its execution. Neither does she claim that she was in custody when she gave her statements. The Court notes that two officers took her into a bedroom described by Officer Dishaw as "very small," and the door was closed. She sat on the bed. Although Nieto was outside the bedroom, he was very close to her while she was being questioned. Officer Dishaw testified that Lech was more cooperative than most people he has interviewed, and that she was not only very cooperative, but "very compliant."

Lech was told at the outset that she was not under arrest and free to go. However, she was not told that she could end the questioning at any time. *Miranda* warnings were not issued. She was never asked whether she wished to speak with Officer Haugraad, but rather she was told Officer Haugaard had some "quick questions" and then she was directed again to come back into the bedroom where questioning began after a brief advisory that she was not under arrest. During the second interview, officers showed Lech a video found on her computer depicting a rape of a 6-year-old girl, as well as additional photographs or videos. Lech clearly did not understand basic computer terms or know common child pornography search terms. Many of her answers consisted of only one word, agreeing with what Officer Haugaard asked her in his leading questions. Lech's voice was almost childlike. Officer Haugaard told her that, if she accepted responsibility, her boyfriend Nieto, who was on probation, would not be "in trouble." Close to the end of the interview, Lech said she was scared. She did not appear to understand that she was being investigated for a crime. Officer Haugraad told Lech what to say in her written

statement, and she followed his directions in writing out a statement full of grammatical errors and lacking even basic sentence structure.

Applying the relevant principles, the Court concludes that Lech's statements were not voluntarily made. None of the factors that concern the Court would in isolation be sufficient to lead to this conclusion. Rather, it is the totality of the circumstances involving: the manner of police entry; the circumstances under which Lech's statements were taken; the lack of *Miranda* warnings; the showing of the video of a rape of a small child and other pictures or videos; the statement that if Lech assumed responsibility, her boyfriend Nieto, who was on probation, would not be "in trouble"; the manner of questioning and the lack of independently responsive answers, which would lead a reasonable officer to question Lech's mental functioning; Officer Haugaard's observation that Lech was different from others he had interviewed by being not only "very cooperative," but "very compliant"; Lech's obvious unfamiliarity with computer terminology commonly associated with child pornography and even basic computer skills; and one of the most troubling facts, the dictation by Officer Haugaard of the statement he wanted a "very compliant" Lech to write and her unquestioning compliance with his direction in producing a statement that showed a lack of education and very limited intellectual functioning. The Court has carefully evaluated the totality of these circumstances. Here, police tactics that might have been perfectly acceptable when used in connection with a suspect of normal intellectual functioning culminated in overreaching or coercion, and resulted in Lech's will being overborne.

15

## CONCLUSION

For the reasons discussed, the Court concludes that the government did not meet its burden of showing that Lech's statements to law enforcement officers on August 5, 2010, were voluntary.

IT IS ORDERED:

1. The Magistrate Judge's Findings and Recommendation (Filing No. 95) is upheld in part and overruled in part as follows:

    a. It is upheld with respect to certain factual findings as discussed above;

    b. Otherwise, it is overruled;

2. The Defendant's Statement of Objections to the Findings and Recommendation (Filing No. 97) is granted in part and denied in part as discussed above; and

3. The Defendant's Motion to Suppress (Filing No. 87) is granted.

DATED this 11th day of October, 2011.

BY THE COURT:

s/Laurie Smith Camp
United States District Judge